UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ JAN 3 0 2004 ★
BROOKLYN OFFICE

THE VIETNAM ASSOCIATION FOR VICTIMS OF AGENT ORANGE/DIOXIN, PHAN THI PHI PHI, NGUYEN VAN QUY, Individually and as Parent and Natural Guardian of NGUYEN QUANG TRUNG and NGUYEN THI THUY NGA, His Children, and DUONG QUYNH HOA, Individually and as Administratrix of the Estate of Her Deceased Child, HUYNH TRUNG SON, On Behalf of Themselves and Others Similarly Situated,

04 CV 400

Plaintiffs,

**CLASS ACTION COMPLAINT**

WEINSTEIN, J.
AZRACK, J.

**JURY TRIAL DEMANDED**

- against -

THE DOW CHEMICAL COMPANY, MONSANTO COMPANY, MONSANTO CHEMICAL COMPANY, PHARMACIA CORPORATION, HERCULES INCORPORATED, OCCIDENTAL CHEMICAL CORPORATION, ULTRAMAR DIAMOND SHAMROCK CORPORATION, MAXUS ENERGY CORPORATION, THOMPSON HAYWARD CHEMICAL COMPANY, HARCROS CHEMICALS INC., UNIROYAL, INC., UNIROYAL CHEMICAL, INC., UNIROYAL CHEMICAL HOLDING COMPANY, UNIROYAL CHEMICAL ACQUISITION CORPORATION, C.D.U. HOLDING, INC., DIAMOND SHAMROCK AGRICULTURAL CHEMICALS, INC., DIAMOND SHAMROCK CHEMICALS, DIAMOND SHAMROCK CHEMICALS COMPANY, DIAMOND SHAMROCK CORPORATION, DIAMOND SHAMROCK REFINING AND MARKETING COMPANY, OCCIDENTAL ELECTROCHEMICALS CORPORATION, DIAMOND ALKALI COMPANY, ANSUL, INCORPORATED, HOOKER CHEMICAL CORPORATION, HOOKER CHEMICAL FAR EAST CORPORATION, HOOKER CHEMICALS & PLASTICS CORP., AMERICAN HOME PRODUCTS CORPORATION, WYETH, HOFFMAN-TAFF CHEMICALS, INC., CHEMICAL LAND HOLDINGS, INC., T-H AGRICULTURE & NUTRITION COMPANY, INC., THOMPSON CHEMICAL

1

CORPORATION, RIVERDALE CHEMICAL COMPANY, ELEMENTIS CHEMICALS INC., UNITED STATES RUBBER COMPANY, INC., SYNTEX AGRIBUSINESS INC., and "ABC CHEMICAL COMPANIES 1-50",

Defendants.

---------------------------------------------------------------------X

## PRELIMINARY STATEMENT

1. This is a civil action brought by Vietnamese nationals and a Vietnamese organization against corporations based in the United States under the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350 and 18 U.S.C. § 2441 for violations of international law and war crimes, and under the common law for products liability, negligent and intentional torts, civil conspiracy, public nuisance and unjust enrichment, seeking money damages for personal injuries, wrongful death and birth defects and seeking injunctive relief for environmental contamination and disgorgement of profits. The claims arise out of the defendants' manufacture and supply of herbicides which were sprayed, stored and spilled in Vietnam from 1961-1975 and which have caused death and injury to the plaintffs and the class they represent, and have contaminated many regions of that country.

## JURSIDICTION AND VENUE

2. The jurisdiction of this Court is invoked under 28 U.S.C. § 1350 (ATCA); 28 U.S.C. § 1332 (Diversity Jursidiction); 28 U.S.C. § 1337 (Regulation of Commerce) and 28 U.S.C. § 1331 (Federal Question). To the extent the plaintiffs' claims are governed by State law, this Court should exercise pendent jurisdiction pursuant to 28 U.S.C. § 1367.

3. Venue is vested in the Eastern District of New York pursuant to 28 U.S.C. § 1391, and 28 U.S.C. § 1407 (Order of the MDL panel).

**JURY DEMAND**

4. Plaintiffs demand a trial by jury of all issues so triable in this action.

**PARTIES**

5. Plaintiff THE VIETNAM ASSOCIATION FOR VICTIMS OF AGENT ORANGE/DIOXIN is a Vietnamese not-for-profit, non-governmental organization whose membership consists of victims of exposure to herbicides used during the war with the United States as well as donors, who are honorary members. The purpose of the organization is to raise funds to pay for treatment and care of victims and to fund environmental remediation and abatement of contaminated areas. The organization is run by an executive board consisting of Vietnamese victims, attorneys, medical and scientific researchers, as well as prominent people from other disciplines.

6. Plaintiffs PHAN THI PHI PHI, NGUYEN VAN QUY, NGUYEN QUANG TRUNG, NGUYEN THI THUY NGA, DUONG QUYNH HOA, HUYNH TRUNG SON are nationals and residents of Vietnam.

7. Plaintiff NGUYEN VAN QUY is the father of plaintiffs NGUYEN QUANG TRUNG and NGUYEN THI THUY NGA, who are minors under the age of 18 years.

8. Plaintiff DUONG QUYNH HOA, is the Administratrix of the Estate of Her Deceased Child, HUYNH TRUNG SON.

9. Upon information and belief, at all times relevant to this action, defendant THE DOW CHEMICAL COMPANY was and still is a corporation incorporated under

the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York.

10. Upon information and belief, at all times relevant to this action, defendant MONSANTO COMPANY, was and still is a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York.

11. Upon information and belief, at all times relevant to this action, defendant MONSANTO CHEMICAL COMPANY was and still is a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York.

12. Upon information and belief, at all times relevant to this action, defendant PHARMACIA CORPORATION was and still is a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York.

13. Upon information and belief, at all times relevant to this action, defendant HERCULES INCORPORATED was and still is a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York.

14. Upon information and belief, at all times relevant to this action, defendant OCCIDENTAL CHEMICAL CORPORATION, was and still is a corporation incorporated under the laws of the State of New York that is registered to do business or in fact does business in the State of New York.

15. Upon information and belief, at all times relevant to this action, defendant

ULTRAMAR DIAMOND SHAMROCK CORPORATION was and still is a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York.

16. Upon information and belief, at all times relevant to this action, defendant MAXUS ENERGY CORPORATION was and still is a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York.

17. Upon information and belief, at all times relevant to this action, defendant THOMPSON HAYWARD CHEMICAL COMPANY was and still is a corporation incorporated under the laws of the State of Missouri that is registered to do business or in fact does business in the State of New York.

18. Upon information and belief, at all times relevant to this action, defendant HARCROS CHEMICALS INC. was and still is a corporation incorporated under the laws of the State of Kansas that is registered to do business or in fact does business in the State of New York.

19. Upon information and belief, at all times relevant to this action, defendant UNIROYAL, INC. was and still is a corporation incorporated under the laws of the State of New Jersey that is registered to do business or in fact does business in the State of New York.

20. Upon information and belief, at all times relevant to this action, defendant UNIROYAL CHEMICAL, INC., was and still is a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York.

21. Upon information and belief, at all times relevant to this action, defendant UNIROYAL CHEMICAL HOLDING COMPANY, was and still is a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York.

22. Upon information and belief, at all times relevant to this action, defendant UNIROYAL CHEMICAL ACQUISITION CORPORATION was and still is a corporation incorporated under the laws of the State of New Jersey that is registered to do business or in fact does business in the State of New York.

23. Upon information and belief, at all times relevant to this action, defendant C.D.U. HOLDING, INC., was and still is a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York.

24. Upon information and belief, at all times relevant to this action, defendant DIAMOND SHAMROCK AGRICULTURAL CHEMICALS, INC. was and still is a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York.

25. Upon information and belief, at all times relevant to this action, defendant DIAMOND SHAMROCK CHEMICALS, was and still is a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York.

26. Upon information and belief, at all times relevant to this action, defendant DIAMOND SHAMROCK CHEMICALS COMPANY was and still is a corporation incorporated under the laws of the State of Delaware that is registered to do business or

in fact does business in the State of New York.

27. Upon information and belief, at all times relevant to this action, defendant DIAMOND SHAMROCK CORPORATION, was and still is a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York.

28. Upon information and belief, at all times relevant to this action, defendant DIAMOND SHAMROCK REFINING AND MARKETING COMPANY was and still is a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York.

29. Upon information and belief, at all times relevant to this action, defendant OCCIDENTAL ELECTROCHEMICALS CORPORATION was and still is a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York.

30. Upon information and belief, at all times relevant to this action, defendant DIAMOND ALKALI COMPANY was and still is a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York.

31. Upon information and belief, at all times relevant to this action, defendant ANSUL, INCORPORATED was and still is a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York.

32. Upon information and belief, at all times relevant to this action, defendant HOOKER CHEMICAL CORPORATION was and still is a corporation incorporated

under the laws of the State of New York that is registered to do business or in fact does business in the State of New York.

33. Upon information and belief, at all times relevant to this action, defendant HOOKER CHEMICAL FAR EAST CORPORATION was and still is a corporation incorporated under the laws of the State of New York that is registered to do business or in fact does business in the State of New York.

34. Upon information and belief, at all times relevant to this action, defendant HOOKER CHEMICALS & PLASTICS CORP. was and still is a corporation incorporated under the laws of the State of New York that is registered to do business or in fact does business in the State of New York.

35. Upon information and belief, at all times relevant to this action, defendant AMERICAN HOME PRODUCTS CORPORATION, was and still is a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York.

36. Upon information and belief, at all times relevant to this action, defendant WYETH was and still is a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York.

37. Upon information and belief, at all times relevant to this action, defendant HOFFMAN-TAFF CHEMICALS, INC. was and still is a corporation incorporated under the laws of the State of Missouri that is registered to do business or in fact does business in the State of New York.

38. Upon information and belief, at all times relevant to this action, defendant

CHEMICAL LAND HOLDINGS, INC., was and still is a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York.

39. Upon information and belief, at all times relevant to this action, defendant T-H AGRICULTURE & NUTRITION COMPANY, INC. was and still is a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York.

40. Upon information and belief, at all times relevant to this action, defendant THOMPSON CHEMICAL CORPORATION was and still is a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York.

41. Upon information and belief, at all times relevant to this action, defendant RIVERDALE CHEMICAL COMPANY was and still is a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York.

42. Upon information and belief, at all times relevant to this action, defendant ELEMENTIS CHEMICALS INC. was and still is a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York.

43. Upon information and belief, at all times relevant to this action, defendant UNITED STATES RUBBER COMPANY, INC. was and still is a corporation incorporated under the laws of the State of New York that is registered to do business or in fact does business in the State of New York.

44. Upon information and belief, at all times relevant to this action, defendant SYNTEX AGRIBUSINESS INC. was and still is a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York.

45. Some or all of the above-listed defendants are successors-in-interest, parent companies, subsidiaries or otherwise associated with or related in interest with the main actors named as defendants herein such that they are liable for the conduct the said main actor defendants.

46. The defendants "ABC CHEMICAL COMPANIES 1-100," names fictitious, actual names and number of such entities being unknown to plaintiffs, are companies which manufactured and supplied herbicides for use in the war with Vietnam from 1961 to 1975, or their successors-in-interest for liability purposes.

**FACTUAL ALLEGATIONS**

Herbicidal Warfare in Vietnam

47. In 1961, the Kennedy Administration inherited a deteriorating situation for the United States in Vietnam, and turned its attention to how the United States might succeed in propping up the government of the Republic of Vietnam (in the south–hereinafter "R.V.") and in gaining a wartime advantage over the Democratic Republic of Vietnam (in the north–hereinafter "D.R.V.") and the National Liberation Front (hereinafter "NLF"). Specific consideration was given to how modern technology might aid the war effort.

48. The U.S. government, with the cooperation of the R.V. government, implemented a program to spray herbicides in Southeast Asia. The military code name

for the entire herbicide operation was "Operation Trail Dust," and it included the spraying of herbicides by airplane, by helicopter, by truck, by boat, and by soldiers on foot. United States Air Force (hereinafter "USAF") aircraft, pursuant to an operation originally codenamed "Operation Hades" and later renamed "Operation Ranch Hand," dispersed more than 95% of all herbicides used in Operation Trail Dust.

49. The purpose of the spraying was twofold: (a) to defoliate forests and mangroves to destroy the vegetative cover used by the D.R.V. and NLF troops for concealment, and (b) to destroy crops to deprive them of food. The spraying lasted from 1961 until the end of the war in 1975.

50. In August through December of 1961, U.S. military personnel using R.V. aircraft conducted limited but successful tests in the spraying of herbicides over southern Vietnam.

51. On or about November 30, 1961, President Kennedy approved a joint recommendation of the Department of State and the Department of Defense to initiate a large scale herbicidal warfare program. Both Departments advocated the use of herbicides for defoliation only, apparently recognizing that the destruction of enemy crops was a clear violation of international law and a war crime.

52. The first major herbicide shipment arrived in Vietnam in January 1962. In September 1962 defoliation operations commenced, and in November 1962 crop destruction operations commenced. For one year after President Kennedy approved the herbicidal warfare program, the spraying of all targets required prior approval from the White House. In late 1962, authority for defoliation targets only was delegated to the U.S. Ambassador to the R.V. It was not until 1963 that authority for crop destruction

targets was delegated by the White House to the Ambassador.

53. U.S. government policy initially emphasized that the U.S. military was merely assisting the R.V. government in the herbicide program. A 1962 pact assigned the ownership of the herbicides to the R.V. government once they were delivered, and R.V. soldiers handled the loading and transportation of the herbicides. The plans for herbicide use were coordinated by the US Embassy to the R.V., the U.S. Military Assistance Command of Vietnam and a subdivision of the Saigon General Staff (of the R.V. government) codenamed "Committee 202."

54. The USAF aircraft used to spray the herbicides were C-123 aircraft which were camouflaged and equipped with removable identification insignia. When performing crop destruction missions, the aircraft bore R.V. insignia, the USAF flight crews wore civilian clothing and were accompanied by a R.V. army crew member, pursuant to a U.S. Department of Defense concept codenamed "Farmgate."

55. The use of herbicides escalated in late 1964 as the war escalated. Controls and limitation on spraying were gradually relaxed and the areas sprayed were expanded. A frequent target of the Ranch Hand operation was the complex of roads and footpaths in southern Vietnam used as a supply route by D.R.V. and NLF personnel, commonly known as the "Ho Chi Minh Trail."

56. The use of herbicides for crop destruction also gradually expanded, and in 1965 alone, 45% of the total spraying was designed to destroy crops. The crop destruction included the spraying of fields suspected of being used by the NLF, however, fields used exclusively by civilians were also frequently sprayed. In 1967 alone at least 20 million litres were sprayed--85% for defoliation purposes and 15% for crop

destruction.

57. Between 1961 and 1971, at least 19,905 sorties were run by the USAF. 1-34 sorties were run daily, with a daily average of 10.7 sorties. 1968 and 1969 were the peak years for herbicide spraying under Ranch Hand. A recent study based on US government documents and using sophisticated mapping techniques has estimated that the total volume of herbicides procured and sprayed from 1961-1971 alone exceeded 76 million litres.

The Herbicides Used

58. Various herbicides were used for defoliation and crop destruction in Vietnam. The different types of herbicides were identified by code names referring to the color of the band around the herbicide container. These included Agent Blue (cacodylic acid), Agent White (a mixture of 80% tri-isopropanol amine salt of 2,4-dichlorophenoxyacetic acid (2,4-D) and picloram), Agent Purple (a formulation of 50% n-butyl ester of 2,4-D, 30% n- butyl ester of 2,4,5-trichlorophenoxyacetic acid (2,4,5-T) and 20% isobutyl ester of 2,4-D), Agent Green (100% n-butyl ester of 2,4,5-T) Agent Pink (60% n-butyl ester of 2,4,5-T and 40% isobutyl ester of 2,4,5-T) and Agent Orange (50-50 mixture of the n-butyl esters of 2,4-D and 2,4,5-T).

59. Approximately 65% of the herbicides contained 2,4,5-T. A synthetic contaminant and unavoidable by-product of the manufacture of 2,4,5-T is TCDD, also known as dioxin. Dioxin is one of the most toxic chemicals known to science.

60. From 1962 to 1965, Agents Purple, Pink and Green were used. From 1965 to 1970, Agents Orange, White and Blue were used, and from 1970 to 1971, only Agents White and Blue were used in the defoliation program. Agent Orange was the

most extensively used herbicide in Vietnam.

61. Phenoxy herbicides such as Agents Orange, Purple, White, Pink and Green are chemical growth regulators that kill certain plants by inducing malfunctions in the biological growth process. Agents Pink and Green were rarely used after Agent Orange was introduced in early 1965. Agent Orange was an effective defoliant when used in heavy concentrations and was used on a wide variety of woody and broadleaf herbaceous plants, causing discoloration and dropping of leaves. Agent White was especially useful in killing conifers. Agent Blue was used primarily for crop destruction.

62. The delivery system initially used aboard the Ranch Hand C-123s to spray the herbicides was the Hourglass spray system, also known as MC-1. Although the Hourglass system was normally capable of distributing herbicide at a rate of 1 gallon per acre, it was modified, for Ranch Hand operations, to distribute 3 gallons per acre. In 1966, the Hourglass system was replaced in all C-123s by a modular spray system.

<u>The International Controversy</u>

63. From the inception of Operations Trail Dust and Ranch Hand, opposition to the herbicidal warfare program sprang up from many different quarters. Several influential people in the U.S. State Department, such as Roger Hilsman and W. Averell Harriman, were opposed to the spraying from the outset, citing its possible effects on the civilian population of Vietnam and the risk that the U.S. would be perceived as a barbaric imperialist.

64. In 1963 a series of articles written by journalist Richard Dudman were published in the St. Louis Post-Dispatch and other newspapers criticizing the herbicidal warfare program as constituting "dirty-war tactics," including the spraying of poison to

destroy rice fields. These articles prompted Congressman Robert W. Kastenmeier of Wisconsin to write to President Kennedy to urge him to renounce the use of herbicides in Vietnam, calling them chemical weapons.

65. In 1964, an article published in the Washington Post described the accidental spraying of a friendly village in southern Vietnam which destroyed the rice and pineapples upon which people depended for their livelihoods. The following day, the Washington Post editorial called for an end to the use of herbicides in Vietnam, because herbicides were too unselective and posed a risk to the civilian population.

66. As early as 1964, the Federation of American Scientists had expressed opposition to herbicides in Vietnam on the grounds that the United States was capitalizing on the war as an opportunity to experiment in biological and chemical warfare.

67. In January 1966, a group of about 30 Boston scientists protested crop destruction as a barbarous and indiscriminate attack on both combatants and noncombatants.

68. In 1967, a petition signed by more than 5,000 scientists, including 17 Nobel laureates and 129 members of the National Academy of Sciences, urging President Johnson to stop using antipersonnel and anticrop chemicals in Vietnam was received by the President's Science Advisor and received wide publicity.

69. Also in 1967, the RAND Corporation issued two reports criticizing the herbicidal warfare program because it was eliminating the food supply upon which Vietnamese farmers depended.

70. Also in 1967, the American Association for the Advancement of Science

urged the U.S. Department of Defense to study the long-range ecological consequences of the herbicidal warfare program. Although the Department of Defense commissioned the Midwest Research Institute to study based upon a survey of existing literature which opined that toxicity to animals and people should not be factor of real concern, the National Academy of Sciences panel that reviewed this report concluded that there was insufficient existing research on the herbicidal warfare program to draw firm conclusions.

71. In 1965 the National Cancer Institute had contracted with the Bionetics Research Laboratory to study the toxicity of certain herbicides and pesticides. In 1966, a preliminary report indicated that 2,4,5-T and 2,4-D could cause malformed offspring and stillbirths in mice. These findings were not released publicly until 1969, when they were inadvertently leaked to (Ralph) "Nader's Raiders."

72. The herbicidal warfare program was considered by most of the international community to be a violation of international law and a war crime. As early as 1966, resolutions were introduced at the United Nations charging the United States with violations of the 1925 Geneva Protocol for the Prohibition of the Use in War of Asphyxiating, Poisonous or Other Gases, and of Bacteriological Methods of Warfare.

73. In 1969, the United Nations General Assembly approved Resolution No. 2603-A, restating that the 1925 Geneva Protocol prohibited the use of chemical or biological agents against plants in international armed conflicts. The resolution specifically declared as a violation of that treaty, the use of any chemical agents of warfare, whether gaseous, liquid or solid, which might be employed because of their direct toxic effects on man, animals or plants. The United States did not accept this

interpretation and voted against the resolution. The resolution was adopted, however, on December 16, 1969 by a vote of 80 to 3 with 36 abstentions.

74. On April 15, 1970, the U.S. Secretaries of Health, Education and Welfare, Agriculture and the Interior issued a joint statement suspending domestic use of herbicides containing 2,4,5-T except for limited non-crop uses. That same day, the U.S. Department of Defense suspended military use of 2,4,5-T, including Agent Orange, "pending a more thorough evaluation of the situation." Thereafter, herbicide spraying for defoliation continued for a short while, using Agent White. Crop destruction, utilizing Agents White and Blue, continued throughout 1970. In January 1971, the last Ranch Hand mission took place.

75. After the U.S. officially ended Operation Ranch Hand in 1971, large quantities of herbicides were left behind, in the possession of the R.V. government. Upon information and belief, more barrels of herbicides were provided by the U.S. and the defendants to the R.V. government in 1973 and 1974.

76. Upon information and belief, the R.V. government continued to use the herbicides in their war effort until it collapsed in 1975.

77. On April 8, 1975, President Ford issued Executive Order 11850 which declared: "The United States renounces, as a matter of national policy, first use of herbicides in war, except under regulations applicable to their domestic use, for control of vegetation within U.S. bases and installations or around their immediate defensive perimeters. . ."

78. During the course of Operation Trail Dust, Operation Ranch Hand and the final period of the war, large numbers of Vietnamese combatants and civilians were

directly exposed to herbicides by spraying. In addition to those who were sprayed directly with the herbicides, many more were exposed indirectly, by coming into contact with plants and water that were contaminated. It has been estimated that up to 4 million Vietnamese were exposed to herbicides during the period 1961-1971.

79. In addition, residues from herbicides transported, loaded and stored at or near USAF bases in Vietnam, such as Bien Hoa, Da Nang, Nha Trang, Phu Cat, the Aluoi and Asau Valleys have led to contamination of the groundwater and food chains in the surrounding areas, resulting in exposure to herbicides by civilians that continues to this very day. The use of herbicides in the war in Vietnam has been called the "largest chemical warfare operation in history, producing considerable ecological as well as public health damage."

<u>The Defendants Role: Manufacture and Supply of the Herbicides</u>

80. The U.S. government asked several chemical manufacturers, including the defendants, to manufacture and sell it specific phenoxy herbicides for use in the herbicidal warfare in Vietnam.

81. In the early 1960's, the U.S. government, pursuant to the Defense Production Act of 1950, entered into a series of fixed price production, or procurement, contracts with the defendants. The contracts instructed the defendants to not to label the contents of the herbicide containers except by a color-coded three-inch band, in accordance with the type of herbicide (orange, purple, blue, etc.).

82. Production of the herbicides began pursuant to the contracts, which were very profitable for the defendants. Defendants were able to sell to the government as much as they were able to produce.

83. Defendants were aware at the time of procurement and production that the herbicides would be sprayed widely in Vietnam for defoliation and crop destruction purposes, but did not object to the intended use of their product. Instead they produced and supplied the herbicides knowing they would be used in herbicidal warfare, in violation of international law.

84. Defendants were aware at the time of procurement and production that dioxin was an unavoidable by-product of 2,4,5-T and that dioxin was extremely toxic to plants, animals and humans but did not object to the intended use of their product. Instead they produced and supplied the herbicides knowing they would be used in herbicidal warfare, in violation of international law.

85. Defendants continued to produce and supply the herbicides even after they had notice that the herbicides were being used to destroy plants and crops in violation of international law.

86. Defendants continued to produce and supply the herbicides even after they had notice that dioxin was toxic to plants, animals and humans and that civilians, combatants and the environment had been adversely affected.

87. Defendants were aware at the time of procurement and production that even very small quantities of dioxin in the diet produced adverse health effects in animals, and that even quantities as low as 5 parts per trillion (ppt) could cause cancerous conditions in rats when supplied on a daily basis.

88. Defendants were aware at the time of procurement and production that concentrations of about 1 part per billion (ppb) could result in premature death from more acute causes and concentrations above 50 ppb produced rapid signs of acute

toxicity and early death. Researchers had found that lower concentrations of dioxin produced the same results as higher concentrations, but took longer to do so.

89. At the time of procurement and production, defendant Dow knew that the dioxin problem arose during the manufacturing process and that any dioxin produced at that stage could carry forward into the delivered product.

90. At the time of procurement and production, defendant Dow knew that in cases of continuous exposure, dioxin could be hazardous in amounts as low as 1 part per million (ppm), which was at that time the lowest level at which dioxin could be readily detected.

91. Defendants had long known before procurement and production of the hazards associated with dioxin and that factory workers exposed to dioxin could develop chloracne, liver damage and other diseases.

92. In 1956, an outbreak of chloracne occurred among workers at a Diamond Alkali plant.

93. In 1949, an accident occurred at Defendant Monsanto's chemical plant in Nitro, West Virginia, in which a substance containing dioxin was dispersed throughout the building, exposing the defendant's workers to the toxic substance.

94. Many of the workers began to complain of health problems and developed symptoms of chloracne and other conditions soon after the accident. A number of the workers were examined and treated by physicians, and several researchers later studied the exposed workers for related health effects.

95. By 1952, defendant Monsanto was aware that dioxin was a by-product and contaminant of 2,4,5-T and was a toxic substance.

96. Defendant Dow had begun producing 2,4,5-T in 1948. Dow had developed the "rabbit ear" test in 1945 to determine the presence of chloracnegens. Dow had corresponded with German firms concerning the toxicity of the substance in the 1950s and had at that time known of chloracne outbreaks among its own and other companies' workers.

97. In February 1964 at Dow's plant in Midland, Michigan, more than 40 workers developed chloracne due to the presence of dioxin, and defendant Dow determined that dioxin was the chloracnegen.

98. Defendant Dow knew that dioxin would be present in the herbicides called for by the procurement contracts in at least the 1 ppm level of sensitivity and based upon animal tests it knew or should have known that dioxin could have deleterious effects even below 1 ppm.

99. Defendant Dow shared this information at a conference it called in March 1965 with the other defendants. Representatives of defendants Hooker Chemical, Hercules, and Diamond Alkali were present, and were told that repeat exposure to 1 ppm of dioxin could be dangerous.

100. Defendant Dow also informed the other participants at the March 1965 meeting that it had sampled other companies' herbicides and had found them to contain relatively high levels of dioxin, and that precautions were necessary to prevent health hazards.

101. All of the defendants were aware of the foregoing incidents of dioxin poisoning and of the fact that dioxin, a dangerous substance was an unavoidable by-product of 2,4,5-T, at the time of procurement and production.

102. The defendants feared that the government, if it learned of the scope of the problem with dioxin, might intervene in a way disastrous to the entire herbicide industry. After the defendants acquired information about the hazards of dioxin, they became concerned about regulation and interference with the herbicide industry if the public was made fully aware of the problem. At that time herbicides were being increasingly used in commercial applications and their manufacture and supply represented a very profitable enterprise for the Defendants.

103. The defendants were aware, at the time of procurement and production, of the existence of the vapor phase chromatography (VPC) method for detecting dioxin in herbicides which was accurate to 1 ppm. The defendants were also aware at this time of the fact that precautions in production and in filtering out dioxin could sharply limit the risk of contamination of the final herbicide.

104. However, the defendants did not take adequate or reasonable measures to reduce the dioxin content of their products or to otherwise prevent or mitigate their toxicity to humans who might come into contact with the herbicide, considering the uses to which it would be put.

105. Neither did the defendants take adequate or reasonable measures to prevent or mitigate the disastrous effect of the herbicides on the environment of the regions in which it would be sprayed.

106. Neither did the defendants adequately warn the government or the general public about the hazards of dioxin before or during the time they produced or supplied the herbicides for the war. In fact the defendants actively concealed the truth about dioxin from the government and the general public before and during the time they

produced and supplied herbicides for the war.

Plaintiff PHAN THI PHI PHI

107. On or about April 1966, plaintiff Phan Thi Phi Phi was a Vietnamese national and a physician residing in Quang Nam province, in South Vietnam.

108. From April 1966 through July 1971, Dr. Phi Phi served as Director of Hospital No. 1, a mobile hospital with different units which moved to various locations in Quang Nam province and Quang Ngai province in southern Vietnam. The hospital units were often located near the Ho Chi Minh trail and near various rivers and streams in the said provinces. Dr. Phi Phi often had to travel along the Ho Chi Minh trail to visit the different hospital units.

109. As Director of Hospital No. 1, Dr. Phi Phi supervised the treatment and care of civilian patients. The hospital also occasionally treated soldiers with acute conditions.

110. The hospital staff, including Dr. Phi Phi, and the patients receiving treatment at the hospital relied upon food they cultivated or found in the nearby valleys for daily sustenance. They drank water drawn from streams near the hospital units or near the Ho Chi Minh trail. Among the foods they cultivated and ate were manioc, rice, corn and other wild fruits and vegetables. They also bought foods like poultry, pigs and other animals and vegetables from local villagers.

111. Quang Nam and Quang Ngai provinces, especially near the Ho Chi Minh trail, were two of the areas heavily sprayed with herbicides manufactured by one, some or all of the defendants pursuant to operations Trail Dust and Ranch Hand both before and during the time of Dr. Phi Phi's residence there. As a result of these operations, the

valleys adjacent to the Ho Chi Minh trail were also heavily exposed to the herbicides, including the valleys in which Dr. Phi Phi and her colleagues cultivated and collected food and water.

112. As a result of exposure to the herbicides, the trees and the fruit and vegetable plants in those valleys were often leafless, and had ceased to bear fruit. As a result, Dr. Phi Phi and her colleagues were forced to harvest and eat the roots of those plants that were edible, such as potato and manioc, not knowing that those roots, as well as the water from the streams that that they relied upon for sustenance, had become poisoned by the herbicides. During the entire period she served as Director of Hospital No. 1, Dr. Phi Phi 9ate food and drank water exposed to the herbicides.

113. From 1971-1972, Dr. Phi Phi became pregnant three times. Each of those three pregnancies ended with Dr. Phi Phi suffering a miscarriage in the first trimester of her pregnancy. Dr. Phi Phi suffered miscarriages in December 1971, July 1972 and November 1972.

114. In 1973, Dr. Phi Phi became pregnant again. Although the pregnancy proceeded normally through the first trimester, on or about July 1973, she again suffered a miscarriage which required hospitalization.

115. Dr. Phi Phi's repeated miscarriages were caused by her exposure to the herbicides and dioxin through her ingestion of food and water drawn from areas sprayed with herbicides.

<u>Plaintiffs NGUYEN VAN QUY, NGUYEN QUANG TRUNG and NGUYEN THI THUY NGA</u>

116. On or about July 1972 plaintiff Nguyen Van Quy was a Vietnamese

national and a soldier serving in the army of the Democratic Republic of Vietnam. His assignment was the repair of communications lines.

117. From April 1972 to July 1972, Nguyen Van Quy's unit marched to southern Vietnam along the Ho Chi Minh trail. From July 1972 until September 1972 Nguyen Van Quy was stationed in Bo Ko. He was then transferred to Quang Ngai where he was stationed from September 1972 to April 1973. From April 1973 until the end of the war in 1975, he was stationed in Quang Nam, near the Ho Chi Minh trail. All of the foregoing provinces were situated in southern Vietnam.

118. During that time period from 1972 through 1975, he would regularly eat manioc, wild grass and other plants he found and he would regularly drink water from streams in areas that had been spayed with herbicide manufactured by one, some or all of the defendants. He could tell that an area had been spayed with herbicide because the trees had no leaves, and when it rained, a very strong and foul odor emanated from the ground for a brief time.

119. On or about August of 1972, one day when he was out collecting wild grass to eat, he came across a barrel which he thought contained oil. Oil was very useful at time for use in lamps. He pierced the barrel with a knife and white powdery substance came pouring out, with a very strong and four odor. Upon information and belief, the white powdery substance was herbicide manufactured by one, some or all of the defendants.

120. During the entire time period that he was stationed in southern Vietnam, Nguyen Van Quy periodically had headaches and felt exhaustion, and his skin was often itchy and broke out in rashes. The skin irritation disappeared after he left Quang Ngai

province in 1973, but the headaches and exhaustion continued and became worse over time.

121. After the war, Nguyen Van Quy returned to his home in Hai Duong province, in northern Vietnam, where he rejoined his family on their farm.

122. In 1984, Nguyen Van Quy was married, and his wife became pregnant. Later that year, Mr. Quy moved to Vung Tao, in southern Vietnam, where he found work as a welder.

123. While Mr. Quy was working in Vung Tao, his pregnant wife had remained with his family in Hai Duong. The pregnancy ended in a stillbirth. The birth was premature and the fetus was deformed.

124. Because of the stillbirth and the deformed fetus, Mr. Quy's wife filed for, and obtained, a divorce from him.

125. Mr. Quy continued to work as a welder in Vung Tao for approximately one year, but had to stop working because of worsening spells of weakness and exhaustion.

126. In 1986, Mr. Quy moved back to his family's home in Hai Duong province, where he depended upon his family for financial support because he was too weak to work.

127. In 1987, Mr. Quy was married again, and he moved to Hai Phong City, into the home of his second wife's family, upon whom he then depended for financial support.

128. His second wife soon became pregnant and in 1988, gave birth to their son, plaintiff Nguyen Quang Trung.

129. Plaintiff Nguyen Quang Trung was born with spinal, limb and developmental defects. His feet are enlarged and deformed. He is unable to coordinate his legs and arms. He has a congenital defect of the spine, which makes it difficult to support his weight. He is developmentally disabled. As a result of the said conditions, Nguyen Quang Trung is unable to stand, walk, or use his hands; he is unable care for himself or attend school or work.

130. Shortly after Nguyen Quang Trung's birth, Mr. Quy's second wife became pregnant again, and in 1989 she gave birth to a daughter, Plaintiff Nguyen Thi Thuy Nga, who was born developmentally disabled and was also born deaf and dumb. As a result, Nguyen Thi Thuy Nga cannot attend school or work and she is not self-sufficient.

131. Mr. Quy's spells of weakness and exhaustion worsened, and in September 2003, he went to Viet Tiep hospital in Hai Phong City to seek treatment, where he was diagnosed with stomach cancer and liver cancer, and discharged.

132. On or about October 20, 2003, Mr. Quy had difficulty breathing and was taken by ambulance to Military Hospital 108 in Hanoi, where he was diagnosed with lung cancer.

133. Mr. Quy has received treatment for cancer, including chemotherapy, which has caused him to lose hair. He is now very weak and has difficulty breathing, and is often home-bound. Although Mr. Quy receives disability payments from the government, they are insubstantial and his wife supports their family by making and selling incense from their home. Mr. Quy and his in-laws care for Nguyen Quang Trung and Nguyen Thi Thuy Nga at their home. Both of Mr. Quy's children are unable to care for themselves and require constant care and attention from Mr. Quy and his family.

134. Mr. Quy's diseases and conditions and his children's birth defects and conditions were caused by his exposure to the herbicides and dioxin through his ingestion of food and water drawn from areas sprayed with herbicides and his direct contact with the herbicides.

Plaintiff DUONG QUYNH HOA

135. In 1964, plaintiff Duong Quynh Hoa was a Vietnamese national and a physician residing in the city of Saigon in southern Vietnam.

136. During that time, she travelled often to the cities Bien Hoa and Song Be, which were heavily contaminated with herbicides manufactured by one, some or all of the defendants.

137. From 1968-1976, plaintiff Dr. Hoa served as Minister of Health of the Provisional Government of the Republic of South Vietnam. During that time she resided in Tay Ninh province.

138. During her time in Tay Ninh, she was told several times to cover her head with plastic bags because US aircraft were spraying chemicals. During that time she also came across a container of the herbicides manufactured by one, some or all of the defendants which had been dropped by US aircraft.

139. In May 1970, Dr. Hoa gave birth to a son, plaintiff Huynh Trung Son. Plaintiff Huynh Trung Son was born developmentally disabled and suffered suffered from epileptic convulsions.

140. Plaintiff Huynh Trung son died at the age of eight months, from a convulsion.

141. After the end of the war, Dr. Hoa began to experience itchiness and rashes

on her skin.

142. In 1971, Dr. Hoa became pregnant, but suffered a miscarriage in in July 1971, in her eighth week of pregnancy.

143. Dr. Hoa became pregnant again but suffered a miscarriage again in January 1972, in her sixth week of pregnancy.

144. After the death of her child and her two miscarriages, Dr. Hoa decided not to become pregnant again.

145. In 1985, after bouts of weakness and fainting spells, Dr. Hoa was diagnosed with diabetes.

146. In 1998, after feeling a lump in her right breast, Dr. Hoa was diagnosed with breast cancer and underwent a mastectomy.

147. In 1999, Dr. Hoa was tested for dioxin, which revealed relatively high levels of the toxin in her blood.

148. Both plaintiff Duong Quynh Hoa's diseases and her son Huynh Trung Son's death were caused by Dr. Hoa's exposure to the herbicides manufactured by one, some or all of the defendants.

The Trade Embargo Against Vietnam 1961-1994

149. Pursuant to its authority under the Trading With the Enemies Act, the U.S. Department of the Treasury imposed a trade embargo on Vietnam.

150. The embargo took effect for nationals of "North Vietnam; i.e., Vietnam north of the 17th parallel" on May 5, 1964.

151. The embargo took effect for nationals of "South Vietnam; i.e., Vietnam south of the 17th parallel" on April 30, 1975, at 12:00 p.m. c.d.t. 31 C.F.R. § 500.201.

152. The embargo prohibited most, if not all, types of transactions, trade and transfers between U.S. nationals and Vietnamese nationals, including those concerning the "issuance, docketing, filing, or the levy of or under any judgment, decree, attachment, execution, or other judicial or administrative process or order, or the service of any garnishment; the acquisition of any interest of any nature whatsoever by reason of a judgment or decree of any foreign country. . ." 31 C.F.R. § 500.310.

153. The embargo also prohibited U.S. nationals and Vietnamese nationals from entering into any contracts for services and from engaging in any dealings in any property, whether "real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future, or contingent." 31 C.F.R. § 500.311.

154. The U.S. trade embargo against Vietnam was partially lifted on or about February 7, 1994, and fully lifted on or about March 9, 1995.

155. On January 28, 1995, an Agreement Between the Government of the United States of America and the Government of the Socialist Republic of Vietnam Concerning the Settlement of Certain Property Claims entered into force. However, this agreement does not cover claims concerning personal or other injuries resulting from herbicide exposure, and no assistance has been given by the U.S. government towards compensating the victims of the herbicidal warfare or cleaning up the environment in Vietnam.

Recent Studies

156. The Agent Orange Act of 1991, passed by the U.S. Congress, directed the Secretary of Veterans Affairs to request that the Institute of Medicine of National Academy of Sciences ("IOM") conduct a comprehensive review and evaluation of

available scientific and medical information regarding the health effects of exposure to the herbicides used in Vietnam and their components, including dioxin. In 1992 the IOM signed an agreement with the Department of Veterans' Affairs to perform the study.

157. The IOM published the results of said study in 1994 and has periodically updated the study thereafter. The published studies and updates have included conclusions and recommendations and have found an association between herbicide exposure and many different types of diseases and defects.

158. The IOM further recommended that the Department of Veterans Affairs develop historical reconstruction methods for characterizing exposure to herbicides in Vietnam. Pursuant to that recommendation a team of scientists at Columbia University led by Jeanne Mager Stellman prepared a study and report, published in the scientific journal Nature on April 17, 2003. This report found that "Large numbers of Vietnamese civilians appear to have been directly exposed to herbicidal agents, some of which were sprayed at levels at least an order of magnitude greater than for similar U.S. domestic purposes," and estimated that two to four million Vietnamese people were affected by herbicide exposure.

159. In 2002, a study performed and published by a team of Vietnamese and Canadian scientists led by Wayne Dwernychuk of Hatfield Consultants Ltd. in the scientific journal Chemosphere (Chemosphere 47 (2002) 117-137) reported that the Aluoi Valley of central Vietnam had sustained extensive environmental contamination by dioxin, and theorized that the contamination resulted from the spraying, storage and transfer of the herbicides used in the war with the United States, and that "the Aluoi Valley is a microcosm of southern Vietnam, where numerous reservoirs of (dioxin) exist

in the soil of former military installations south of the former demilitarized zone."

160. In 2003, a study by a team of researchers led by Arnold Schecter, a professor of environmental sciences at The University of Texas, published in the August 2003 issue of the Journal of Occupational and Environmental Medicine, found dioxin contamination in the environment and food chain in Bien Hoa City in southern Vietnam. The study specifically found that dioxin continues to poison people in exposed areas through the intake of contaminated food.

## GENERAL ALLEGATIONS

161. The acts of defendants described herein were inflicted under color of law and under color of official authority and in conspiracy with and on behalf of those acting under color of official authority, and were inflicted deliberately and intentionally.

162. The acts of defendants and the injuries sustained by plaintiffs and their next-of-kin described herein were part of a pattern and practice of systematic human rights violations designed, implemented and directed by defendants and their agents, from which the defendants received profits and were greatly enriched.

163. The defendants conspired with the governments of the U.S. and the R.V. to commit the various violations of international law and laws of the United States, Vietnam and the State of New York, and all acts of the defendants described herein were performed in furtherance of the conspiracy to violate the rights of the plaintiffs and did, in fact, advance the objectives of the conspiracy and assist in the commissions of said violations of law.

164. As a direct and proximate result of defendants' unlawful conduct, plaintiffs have suffered and will continue to suffer physical injuries, pain and suffering

and extreme and severe mental anguish and emotional distress, plaintiffs have incurred and will continue to incur medical expenses, and plaintiffs have suffered and will continue to suffer a loss of their means of economic support. Plaintiffs are thereby entitled to general and compensatory damages in amounts to be proven at trial.

165. The conduct of defendants and their agents and employees, as described herein, was malicious, fraudulent and/or oppressive and done with a willful and conscious disregard for plaintiff's rights and for the deleterious consequences of the defendants' actions, and was motivated solely by the desire for profit at the expense of plaintiff's lives, health and well-being. Consequently, plaintiffs are entitled to punitive damages from each of the defendants.

166. As a direct and proximate result of the defendants' conduct, the environment in Vietnam has been become contaminated with toxic substances, and will require remediation and abatement. Plaintiffs are therefore entitled to injunctive relief, in the form of an Order of this Court directing the defendants to provide for said remediation and abatement.

167. The defendants profited from acts which constitute war crimes and violations of international law, as well as intentional torts under the common law, and have been unjustly enriched thereby. Defendants should not profit from these heinous acts, and plaintiffs are therefore entitled to injunctive relief, in the form of an Order of this Court directing the defendants to provide an accounting of the profits received by the defendants from the manufacture and supply of the herbicides used in the war in Vietnam, and to pay to the plaintiffs a sum of money equivalent to the entire amount of said profits, with interest from the date of the earliest procurement contracts.

168. Defendants are jointly and severally liable for all of the damages incurred by the plaintiffs. In the alternative, defendants are liable proportionally for the plaintiff's damages according to their proportional market share of the herbicides they manufactured and supplied which were used in the herbicidal warfare.

169. Defendants' actions have violated, and plaintiffs causes of action arise from, the following laws, agreements, conventions, resolutions and treaties, which constitute specific examples of the applicable law of nations or customary international law:

A. Alien Tort Claims Act, 28 U.S.C. §1350;

B. Torture Victim Protection Act, 28 U.S.C. § 1350;

C. War Crimes Act, 18 U.S.C. § 2441;

D. 1925 Geneva Protocol for the Prohibition of the Use in War of Asphyxiating, Poisonous or Other Gases, and of Bacteriological Methods of Warfare

E. Article 23 of the Annex to the Hague Convention IV, Respecting the Laws and Customs of War on Land, signed 18 October 1907;

F. Geneva Convention relative to Protection of Civilian Persons in Time of War, signed at Geneva 12 August 1949;

G. Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis and Charter of the International Military Tribunal at Nuremberg, signed and entered into force August 8, 1945;

H. United Nations Charter, signed at San Francisco on June 26, 1945

and entered into force on October 24, 1945;

I. United Nations General Assembly Resolution No. 2603-A (1969)

J. Customary international law;

K. Common law of the United States of America;

L. The laws of Vietnam;

M. Common law of the State of New York, including but not limited to products liability, assault and battery, negligence, recklessness, intentional infliction of emotional distress, negligent infliction of emotional distress, civil conspiracy, unjust enrichment, and public nuisance.

**CLASS ALLEGATIONS**

170. Plaintiffs bring this action on behalf of themselves and all other Vietnamese nationals who were exposed to herbicides used in the war with the United States at any time and were in any way injured, became ill, suffered from birth defects, or died as a result. This action is not brought on behalf of those persons exposed who may manifest illness or injury in the future. The plaintiffs propose organizing the class into subclasses for each type of disease or defect, e.g. one subclass for lung cancer victims, one for type II diabetes victims, one for children with limb reduction birth defects, one for wrongful death victims, etc.

171. Upon information and belief, this class of persons consists of not less than two to four million persons, and the class is thus so numerous that individual joinder of all members is impracticable under the standards of Fed. R. Civ. P. 23 (a)(1). As demonstrated by the factual allegations herein, the class consists of millions of persons.

While the exact number and identities of the class members are unknown at this time, such information can be ascertained through appropriate investigation and discovery.

172. There are questions of law and fact common to the class which predominate over any questions affecting only individual members or subclasses. Common questions of law and fact include the following:

A. Whether the plaintiffs state a valid claim under the ATCA, the TVPA and 18 U.S.C. § 2441 for violations of international law and war crimes and whether defendants were complicit in those crimes;

B. Whether the statute of limitations for plaintiffs' claims should be tolled because of the war and the trade embargo imposed upon Vietnam;

C. Whether the Eastern District of New York is the proper venue for the plaintiffs' claims;

D. Whether the herbicides manufactured and supplied by defendants generally cause the illnesses and injuries alleged by the plaintiffs;

E. Whether the defendants knew or should have known of the dangers of the dioxin present in their herbicides and whether they failed to disclose or fraudulently concealed information about the dangers in violation of law; and

F. Whether the defendants are entitled to immunity for their actions under the "government contractor defense," notwithstanding the principles enunciated by the International Military Tribunal at

Nuremberg.

Only the amount of individual damages sustained by each class member will vary.

173. The claims of the named plaintiffs are typical of the claims of the above-described class in that all of the members of the class have been similarly affected by the defendants' common course of conduct, and the members of each subclass have identical claims against the defendants.

174. The named plaintiffs and representatives for each subclass will fairly and adequately protect the interests of the members of the class, in that their interests are not adverse to the interests of the other members of the class. The named plaintiffs have retained attorneys experienced in the prosecution of complex litigation and class action litigation.

175. A class action is superior to other available methods for the fair and efficient adjudication of the controversy under the standards of Fed. R. Civ. Proc. 23 (b)(3). The individual class members do not have the resources to pursue individual litigations, and even if they did, such litigation would unduly burden the courts. Individual litigation would magnify the delay and expense to all parties in resolving the controversies engendered by the defendant chemical companies' common course of conduct. The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy and the fair and equitable hearing of all of plaintiffs' claims in a single forum. The conduct of this action as a class action conserves the resources of the parties and of the judicial system, and protects the rights of each class member. For most, if not all, class members, a class action is the only feasible mechanism that allows them an opportunity for legal redress and justice.

176. This action is also certifiable under the provisions of Fed. R. Civ. Proc. 23(b)(1) and/or 23(b)(2) because:

A. Inconsistent or varying adjudications with respect to individual members of the class or each subclass would establish incompatible standards of conduct for the defendants toward that class;

B. Adjudications of individual class members' claims with respect to the defendants would, as a practical matter, be dispositive of the interests of other members not party to the adjudications, and could substantially impair or impede the ability of other class members to protect their interests;

C. With respect to each class member, the defendants have acted and/or refused to act on grounds generally applicable to that class, thereby making equitable relief with respect to the class as a whole appropriate.

177. The named plaintiffs bring this action and all claims for relief herein on behalf of themselves individually and all persons similarly situated as a class action pursuant to Federal Rule of Civil Procedure 23 against defendants herein.

**FIRST CLAIM FOR RELIEF**
**(War Crimes)**

178. Plaintiffs repeat each and every allegation previously made herein.

179. The acts described herein against Plaintiffs constitute violations of the laws and customs of war, also known as war crimes, which prohibit the use of any

chemical agents of warfare, whether gaseous, liquid or solid, which might be employed because of their direct toxic effects on man animals or plants and generally prohibit the poisoning of food and water supplies in the course of war. Leaders, organizers, facilitators, conspirators, accomplices participating in the formulation and execution of these acts are responsible for all acts performed by any person in execution of such plan.

180. The acts described herein constitute war crimes in violation of the ATCA, TVPA, customary international law, the common law of the United States of America, the common law of the State of New York, the laws of Vietnam, and the international treaties, agreements, conventions and resolutions described in paragraph 169 herein.

181. The defendants are liable to the plaintiffs for said conduct in that defendants facilitated and conspired with the government of the United States in bringing about the war crimes committed against the plaintiffs.

**SECOND CLAIM FOR RELIEF**
**(Crimes Against Humanity)**

182. Plaintiffs repeat each and every allegation previously made herein.

183. The acts described herein against Plaintiffs constitute crimes against humanity, in violation of customary international law which prohibits inhumane acts of a very serious nature such as willful killing and torture and other inhumane acts committed as part of a widespread or systematic attack against any civilian population or persecutions on political, racial or religious grounds. Leaders, organizers, facilitators, conspirators, accomplices participating in the formulation and execution of these acts are responsible for all acts performed by any person in execution of such plan.

184. The acts described herein constitute crimes against humanity in violation

of the ATCA, TVPA, customary international law, the common law of the United States of America, the common law of the State of New York, the laws of Vietnam, and the international treaties, agreements, conventions and resolutions described in paragraph 169 herein.

185. The defendants are liable to the plaintiffs for said conduct in that defendants facilitated and conspired with the government of the United States in bringing about the crimes against humanity committed against the plaintiffs.

**THIRD CLAIM FOR RELIEF**
**(Torture)**

186. Plaintiffs repeat each and every allegation previously made herein.

187. The acts described herein constitute torture of the plaintiffs as plaintiffs were placed in great fear for their lives and were caused to suffer severe physical and psychological abuse and agony. The tortures of the plaintiffs as described herein were inflicted deliberately and intentionally for purposes which included, among others, punishing the victim or intimidating the victim or third persons.

188. The acts described herein constitute torture in violation of the ATCA, TVPA, customary international law, the common law of the United States of America, the common law of the State of New York, the laws of Vietnam, and the international treaties, agreements, conventions and resolutions described in paragraph 169 herein.

189. The defendants are liable to the plaintiffs for said conduct in that defendants facilitated and conspired with the government of the United States in bringing about the torture committed against the plaintiffs.

**FOURTH CLAIM FOR RELIEF**
**(Assault and Battery)**

190. Plaintiffs repeat each and every allegation previously made herein.

191. As a result of these acts, plaintiffs were placed in great fear for their lives and were caused to suffer severe physical and psychological abuse and agony.

192. Defendants acts were willful, intentional, wanton, malicious and oppressive.

193. The defendants are liable to the plaintiffs for said conduct in that defendants facilitated and conspired with the government of the United States in bringing about the assault and battery committed against the plaintiffs.

194. The acts described herein constitute assault and battery, actionable under the laws of the United States, Vietnam and New York.

**FIFTH CLAIM FOR RELIEF**
**(Intentional Infliction of Emotional Distress)**

195. Plaintiffs repeat each and every allegation previously made herein.

196. The acts described herein constitute outrageous conduct in violation of all normal standards of decency and were without privilege or justification.

197. These outrageous acts were intentional and malicious and done for the purposes of causing plaintiffs to suffer humiliation, mental anguish and extreme emotional and physical distress.

198. As a result of these acts, plaintiffs were placed in great fear for their lives and were caused to suffer severe physical and psychological abuse and agony.

199. The defendants are liable to the plaintiffs for said conduct in that defendants facilitated and conspired with the government of the United States in bringing about the intentional infliction of emotional distress of the plaintiffs.

200. Defendants' outrageous conduct constitutes the intentional infliction of emotional distress, and is actionable under the laws of the United States of America, Vietnam and the State of New York.

**SIXTH CLAIM FOR RELIEF**
**(Negligent Infliction of Emotional Distress)**

201. Plaintiffs repeat each and every allegation previously made herein.

202. The actions of defendants, and each of them, constituted a negligent infliction of emotional distress upon the plaintiffs.

203. Defendants, and each of them, carelessly and negligently inflicted said emotional distress through wanton and reckless conduct in manufacturing and supplying herbicides contaminated with dioxin for use in the herbicidal warfare.

204. As a direct and legal result of defendants' wrongful acts, plaintiffs and plaintiffs immediate family members have suffered and will continue to suffer significant physical injury, pain and suffering and extreme and severe mental anguish and emotional distress.

205. The defendants are liable to the plaintiffs for said conduct in that defendants facilitated and conspired with the government of the United States in bringing about the negligent infliction of emotional distress of the plaintiffs.

206. Defendants' conduct constitutes the negligent infliction of emotional distress, and is actionable under the laws of the United States of America, Vietnam and the State of New York.

**SEVENTH CLAIM FOR RELIEF**
**(Negligence)**

207. Plaintiffs repeat each and every allegation previously made herein.

208. Defendants failed to use ordinary or reasonable care in order to avoid injury to plaintiffs. Defendants' negligence was a cause of injury, damage, loss or harm to plaintiffs and their next of kin.

209. As a result of the defendants' negligence, plaintiffs have suffered and will continue to suffer significant physical injury and pain and suffering, and plaintiffs have incurred and will continue to incur medical expenses, loss of earnings and loss of companionship, care and consortium of their immediate family members.

210. Defendants' conduct constitutes negligence, and is actionable under the laws of the United States of America, Vietnam and the State of New York.

**EIGHTH CLAIM FOR RELIEF**
**(Wrongful Death)**

211. Plaintiffs repeat each and every allegation previously made herein.

212. Plaintiff DUONG QUYNH HOA, is the mother of HUYNH TRUNG SON, now deceased.

213. As a direct result of the defendants' acts and omissions and as a result of the death of her son, plaintiff DUONG QUYNH HOA has sustained pecuniary loss resulting from loss of society, comfort, attention, services and support of decedent HUYNH TRUNG SON.

214. The defendants are liable to the plaintiffs for said conduct in that defendants facilitated and conspired with the government of the United States in bringing about the wrongful death of decedent HUYNH TRUNG SON.

215. The acts described herein constitute wrongful death, actionable under the laws of the United States of America, Vietnam and the State of New York, and plaintiff

DUONG QUYNH HOA claims for relief on behalf of her deceased son.

**NINTH CLAIM FOR RELIEF**
**(Strict Products Liability)**

216. Plaintiffs repeat each and every allegation previously made herein.

217. The defendants manufactured and supplied the herbicides mentioned herein to the U.S. and R.V. governments.

218. At the various times mentioned herein, the plaintiffs were exposed to said herbicides, as a result of the spraying, transfer, storage or leakage of said herbicides, and as a result of said exposure, suffered serious and permanent injuries and loss of life.

219. The negligence of the defendants, its servants, employees and agents consisted of manufacturing and supplying the above-mentioned herbicides without making proper and sufficient tests to determine the dangers and contraindications of the herbicides, in that defendants knew, or in the exercise of reasonable diligence, should have known that the herbicides were unsafe and unfit for use by reason of the dangerous effects to human health and the environment, in negligently failing to adequately warn the public and the U.S. and R.V. governments of the dangers and contraindications of the herbicides, in failing to properly inspect the herbicides, and in concealing the dangers and contraindications of the herbicide from the public and from the U.S. and R.V. governments in order to profit from the manufacture and supply of the herbicides.

220. Upon information and belief, the defendants conspired and to cooperate and exchange in mutual assistance in order to bring the above-mentioned herbicides to the market and secure approval from the appropriate government agencies, although they knew or should have known that the herbicides contained dioxin and had the potential to

become a cancer producing agent and to cause birth defects and that the herbicides were otherwise hazardous to human health and to the environment.

221. Upon information and belief, the defendants, as a result of the conspiracy and mutual cooperation, by misrepresenting the risks inherent in the use of the herbicides, were successful in securing approval for the manufacture and supply of the herbicides by the appropriate government agencies and brought the herbicides to the market, so as to induce their use in the manner in which it was used by the U.S. and R.V. governments.

222. By reason of the above, the defendants are jointly and severally liable to the plaintiffs under the doctrine of strict products liability, actionable under the laws of the United States of America and the State of New York.

223. In the event that the defendants should not be held jointly and severally liable, then the defendants will be liable to the plaintiffs because of their participation in the enterprise in which they participated in manufacturing and supplying the herbicides and in gaining approval for the marketing and sale of the herbicides.

224. By reasons of the above, plaintiffs have suffered and will continue to suffer significant physical injury and pain and suffering, and plaintiffs have incurred and will continue to incur medical expenses, loss of earnings and loss of companionship, care and consortium of their immediate family members.

**TENTH CLAIM FOR RELIEF**
**(Public Nuisance)**

225. Plaintiffs repeat each and every allegation previously made herein.

226. The defendants manufactured and supplied herbicides containing dioxin to

the U.S. and R.V. governments knowing that the herbicides would be used in the war in Vietnam.

227. Dioxin is one of the most toxic chemicals known to science.

228. The herbicides manufactured and supplied by the defendants were sprayed, transferred, stored and spilled in Vietnam, contaminating the environment in many regions of that country, and the defendants conspired with the U.S. and R.V. governments in inflicting said contamination.

229. Defendants' acts and omissions constitute a nuisance, and are injurious to the health and well-being of the plaintiffs, members of the plaintiff's organization, members of the plaintiff's families as well as neighbors and guests of the plaintiffs.

230. The plaintiffs and their members and their families have suffered from diseases, defects, ill health and other conditions as a result of the acts and omissions of the defendants, and have no adequate remedy at law.

231. Plaintiffs seek an Order of this Court directing the defendants to provide for the remdiation and abatement of the contamination caused by the herbicides they manufactured and supplied in all areas so contaminated in Vietnam.

**ELEVENTH CLAIM FOR RELIEF**
**(Unjust Enrichment)**

232. Plaintiffs repeat each and every allegation previously made herein.

233. Defendants have been unjustly enriched to the detriment of the plaintiffs because they have received profits from their unlawful activities which constitute war crimes and crimes against humanity and which have otherwise violated the laws of the United States of America, Vietnam and the State of New York, all to the detriment of the

plaintiffs.

234. As a result of defendants' unjust enrichment, plaintiffs have been damaged in an amount to be determined at trial upon an accounting of the profits received by the defendants for the manufacture and supply of the herbicides used in the war in Vietnam, with interest from the date of the first procurement contract.

235. Plaintiffs have no adequate remedy at law.

236. Plaintiffs seek an Order of this Court directing defendants to: A. Make available forthwith all documents or other records needed to determine the profits received from the production and supply of herbicides used in the war in Vietnam, B. Produce an accounting of said profits and C. Disgorge said profits to the plaintiffs, with interest from the date of the first procurement contract.

**TWELFTH CLAIM FOR RELIEF**
**(Injunctive and Declaratory Relief)**

237. Plaintiffs repeat each and every allegation previously made herein.

238. As a result of the defendants conduct, plaintiffs have been injured, and in the absence of injunctive relief, will be irreparably harmed. Plaintiffs have no adequate remedy at law. Plaintiffs therefore seek injunctive relief under the laws of equity to remedy their injuries and prevent any future injury to their persons, or to all those similarly situated.

239. There is an actual controversy between all plaintiffs and the defendants, and plaintiffs seek a declaration of their rights to be free of contamination by toxic substances manufactured and supplied by the defendants, and each of them.

**PRAYER FOR RELIEF**

240. Wherefore, each and every plaintiff on behalf of themselves and those similarly situated prays for judgment against all defendants as follows:

A. For compensatory damages;

B. For punitive damages;

C. For injunctive and declaratory relief, including, but not limited to, an Order:

i. Directing defendants to provide environmental remediation and abatement of all contaminated areas in Vietnam; and

ii. Directing defendants to provide an accounting of the profits received by the defendants from the manufacture and supply of the herbicides used in the war in Vietnam, and to pay to the plaintiffs a sum of money equivalent to the entire amount of said profits, with interest from the date of the earliest procurement contracts;'

iii. Declaring the actions and omissions of the defendants to be violations of international law and war crimes; and

D. For costs of suit, attorney's fees and such other relief as the Court deems just and proper.

Dated: New York, New York
January 30, 2004

CONSTANTINE P. KOKKORIS
(CK-6045)
Attorney for Plaintiffs
225 Broadway, Suite 612

New York, New York 10007
(212) 349-9340

MOORE & GOODMAN, LLP
Attorneys for Plaintiffs
740 Broadway
New York, New York 10003
(212) 353-9587